Good afternoon everybody. We're here today for oral argument in case 22-1864 Doe v. University of Southern Indiana. Judge Hamilton is appearing via Zoom. I'm Judge Brennan. I am here and Judge St. Eve is here. We're going to, thank you, we're going to begin with oral argument and first we'll start with Mr. Bondre. David, can you, Judge Hamilton, can you see me? I cannot see you. Okay, thank you. Go ahead. You may approach. Thank you. May it please the court, Keith Bondre for John Doe who asked this court to reverse the district court's denial of his motion for a preliminary injunction. Anti-male bias in a university succumbs to public pressure, accusing it of not taking male-on-female sexual assault seriously. These events happen in this case and when they're taken together with USI's suppression of evidence that exonerates John, there is a plausible inference of gender bias. This means John established some likelihood of, excuse me, success on the merits. Mr. Bondre, the way you've just framed that issue and the way you've written your brief seems to indicate that you think that if you could beat a motion to dismiss or perhaps a motion for summary judgment, you've established sufficient likelihood of success. Is that right? Judge, I don't think that's what we're arguing. I think what we're arguing is the law of this court is Doe v. Perdue. And whether it's at a motion to dismiss stage, as it was in that case, or whether it's a preliminary injunction as we are here, it's all in the context of a Title IX proceeding. And what Doe v. Perdue says is we don't just take one of these procedural flaws or we don't take the public pressure in isolation. We have to take them all together. It's a totality of the circumstances. So I understand that point. But when I hear you say there's a plausible inference, that sounds to me like a 12 v. 6 standard. And I don't think that's what applies at a preliminary injunction stage. I certainly agree with that, Your Honor. And that is not the point we're trying to clarify is what was omitted in the district court's opinion. And that's the standard here for John, is some likelihood of success on the merits. It's not a slam dunk. It doesn't have to be a good case. I think it's the Cavell case that this court cites in its handbook on a motion to stay, which is the same analysis on a preliminary injunction. Before you go too far down that road, please, can I ask you a question about the standard of argue clearly erroneous and whether or not the district court clearly erred. But wouldn't this be de novo review on the question of whether or not you've established a likelihood of success on the merits? I don't see the district court making factual determinations that would require the clearly erroneous standard. Correct. The district court, in its opinion, made legal conclusions. So it would be a de novo. Correct, Judge. Thank you. What do you do, though, with the extensive case law saying that we review granting and denying preliminary injunctions for abuses of discretion? Judge, I think what we have here, we've got the district court order that made certain conclusions of law. And as Your Honor, St. Eve just pointed out, that standard is going to be de novo. To the extent the court made a finding of a factual event, historical event, that's going to be the clearly erroneous standard. And to Your Honor's point on a preliminary injunction, that's going to be abuse of discretion. But here, because we have facts that are conceded by Southern Indiana, namely the procedural irregularities, coupled with, taken together with... I have to tell you, I'm not persuaded they've conceded much of anything along those lines. The appellate officer went through the supposed procedural irregularities in some detail. Some of the things that you're complaining about applied equally to both the respondent and the invited by the respondent, Mr. Doe. It's a little hard to see how those sorts of things show male bias, anti-male bias. And I think perhaps what Your Honor is asking is, how do we show the difference of anti-male bias and respondent bias? Well, that's part of it. But I'm also asking, you've given us a long list of supposed procedural errors. And that's relevant, obviously, under Purdue and case law from around the country. But, for example, there's the... you focus heavily on Jane's references to reports from other women about the way John Doe treated them. That sure looks to me like a door opened by John in his response to the original charge and investigative report. Your Honor, I don't agree with that. The way the Title IX actual hearing went on August 5 of 2021, all of the questioning about that prior history that you just spoke about came from the hearing officer to Jane Doe within the first hour. So that was not invited by John Doe. That came after John had made an issue of that in his written submissions before the hearing. I think Your Honor and I are just going to have to disagree that that's what the record shows. You're disagreeing whether his written response raised this point? I don't think anything that John Doe did at the Title IX level on campus waived anything. That's not my question. Let's make sure we're understanding each other on the factual record here. Did he raise the explanation? Sorry, this is in his response. Judge, I thought you said did he waive first time. You're saying did he raise within an hour? Raise, yes. And your response to that is? I need the question again. Okay, that's fine. All right, I'm reading from his response submitted on July 5, 2021 to Mr. Peterson's investigative report. Bottom of page three, changing the names. He is talking about Jane and her roommate having pressured Jane to make the false report having made numerous online posts falsely accusing me of assaulting other USI women, etc. I think there's a clear distinction between that written response in July from the evidence that was presented in the hearing in August 5. Because in August 5, we're supposed to have, according to USI, top shelf Title IX professionals to conduct the questioning and answering that your honor speaks of. But we're not asking the court to take that in a vacuum. That's just one procedural irregularity. When you take the totality of those, and I think we list 11 or 12, and you couple it with the public pressure that USI had on campus. There was a school newspaper article, USI is not taking sexual assault seriously. There was a online petition. But I guess even before you get there, the question is how could that be a procedural irregularity if she relied on statements of other female students about your client's behavior when those statements came out in response to questions that were asked and your client's submission that opened the door? Again, I'm going to have to disagree that it opened the door because the submission is an act and frankly is not evidence at the hearing. That's why you have a hearing. The final rule says, as the court well knows, that at post-secondary educational institutions, you have to have a due process hearing. So the report isn't evidence. It's just the report. The evidence is what the hearing officers heard on August 5. So there were questions asked of her about why she waited until February of 2021 to come forward. And those questions appeared to be geared at, was this made up? You waited so long, why didn't you do anything in November of 2020? You waited until February of 2021. And her response in part to that was, well, I was aware at that point of these other women complaining as well. And I felt compelled to come forward then. So is it your response or your argument that the panel should just ignore those statements? Not ignore the statements. The panel then shouldn't go further down that road because they know that the information, alleged information of these other women is not relevant. But it was the question. But why wouldn't it be relevant to assessing Jane's credibility as to why she came forward? The question, why did you come forward and the answer that you said, A, okay. But then the next question, well, what did you hear? What did they tell you? What happened next? A top shelf Title IX hearing officer does not do that. Because that evidence, that doesn't go to Jane coming forward. That was established in the answer that you just quoted. So that road needed to stop. I see that I've gone past. I would like to reserve about the four minutes. Thank you. Remainder of your time will be reserved. I raised a couple of other questions with you. At least in my limited experience so far with Title IX cases, I was a little surprised to see that it looks as if everyone involved, the investigator, the hearing officer, and other members of that panel, and the appellate officer were all unaffiliated with USI, as I understand it. Is that right? That is correct. Why is that not a reasonably satisfactory way of insulating the decision in an individual case from the kind of public pressure you're talking about on a college campus? I think all of the individuals that you just spoke to, even though they might not have an office at USI, they certainly are engaged by USI. They work for USI in this capacity. They're compensated by USI. And they're just a mere extension of USI. So I don't think there's insulation at all. Just because they're contractors. Whether they're a contractor or whether they're a W-2 employee, they're still acting on behalf of the university. Well, there's no doubt that they are acting on behalf, but they're not on campus. As I recall, the hearing officer wasn't even sure what time it was in southwest Indiana, which is not an uncommon situation for people who aren't from there. Being born and raised my whole life in Evansville, yes, I wish we were not on different times. Having spent quite a few years in Evansville myself, I understand the situation. Let's see. Is it your contention, Mr. Verandere, that not only the hearing officials, but also the investigator and the appellate reviewer were biased against men? Well, it's our position that when you take all of the events together, which is what Doe v. Perdue says that you do in a Title IX context, that the inference is certainly there that decisions were made based on his status as a male. Thank you. Thank you, Mr. Verandere. You will receive some rebuttal time. Mr. Keeley, we'll turn to you. Thank you, Your Honor. Good afternoon. May it please the Court. William Keeley for the University of Southern Indiana, the appellee. The appellant has raised the bar very high on himself. As the briefing has progressed, he has progressed his theory of relief, now alleging that this was, in effect, a sham undertaking by the university. In his words in his reply briefing, that John's designated evidence shows the same as merely a pretext for USI's anti-male bias, quoting this court's Evero decision, pretext means a dishonest explanation, a lie, rather than an oddity or an error. Page 16 of the reply brief. That is the standard that the appellee, the appellant, John Doe, set out to prove. No evidence, even approximating a lie, a dishonest explanation, was adduced in the A dishonest explanation would have to take one of two forms, either showing that the authors, the panelists, who wrote the decision, didn't believe what they wrote, didn't believe it, it's a sham. There is no such evidence. There's no evidence at all from those panelists, other than the audio and transcript of the hearing and their report. There is no argument that anything in the audio is anything less than earnest by them as a panel in the day-long hearing, or that the decision that they wrote is anything less than earnest. One could, I suppose, construe John's theory as some sort of cat's paw theory, that the university had an intent and imposed that intent on the hapless panelists, the hapless investigator, the hapless appeal officer by, and they all complied. But as it has already been noted, they were all contractors, professionals of high repute and credential, certainly dedicated to their craft. There is no basis, even for a supposition or inference, that they would function like an employee in a cat's paw scenario. Billy, can I ask you a couple of quick factual points? Do you agree that the entire decision, including the sanction, was delegated to these contractors? Yes, it was, your honor. Is that common in Title IX practice these days? It has become more common since the 2020 Department of Education regulations, what we refer to as the grievance process regulations, took effect in August of 2020. They are demanding regulations. They require a lot of effort, a lot of competency, and schools have, at times, especially schools that are lightly resourced, like USI, don't have a big inside staff. I don't think I've heard that expression, lightly resourced. Sounds like something from the Legislative Budget Committee. We could say that about the judiciary, too. Says the chair of the Budget Committee. All right, well, Mr. Keeley, let me ask you also, is it correct that Jaynes was the only formal Title IX complaint against John? Yes, to my understanding, to the record that's been adduced and made available in the course of this case, yes. Okay, and then I wanted to ask you a couple of questions. One, well, about in terms of the hearing itself, your brief emphasizes John's and his attorney's failure to object to various points that he's complaining about in this appeal. As I understand it, however, from the ground rules for the hearing, Mr. Vandere was not exactly relegated to being the proverbial potted plant in the hearing, but he certainly did not have the kind of abilities to object, argue, and challenge procedures that we would be used to if we were dealing with an appeal from a trial court. Certainly, the expectation was that in the course of the witness examinations that the advisor would not do the sorts of things a lawyer might do in open court during trial of the sort you've just sketched. However, Mr. Vandere and his firm were engaged in this process from very early on throughout the investigation, participated in the response to the investigation, the July 5th document that the court referenced a short time ago, and met with USI's Title IX coordinator just a day or two before the hearing to review the process. These were all periods of time and junctures where there was ample opportunity either face-to-face or in writing to raise concerns. And following the hearing, during the three weeks between the hearing's conclusion and the issuance of the ruling on August 25th, ample opportunity for any lawyer who has a concern of the gravity that supposedly is being expressed now, a pretext, a sham proceeding, a dishonest proceeding, to say something. One lawyer wouldn't. Well, yeah, a lawyer who's been told to keep quiet might take that approach, but it's a in this, under these regs. I also had a couple of questions for you about the issue of irreparable harm here. The, on the argument about whether a suspension will go on John's permanent record and to me you danced around it in your red brief because it sure looks to me like the university policy says that a suspension is permanent. Suspension is a matter of permanent record. A permanent record indicates that student behavior files may be retained indefinitely. Is that correct? So there are two different propositions embedded in that question. The first is what does the transcript or public facing document show? And the second is what do USI's internal records continue to show? So the grievance process regulations, 34 CFR 106.45, have a record keeping requirement in them, section, one of the final sections, B10 I believe it is, that requires nearly all the records generated in the course of this process to be kept for at least seven years. Right. So there is, which is perhaps not perpetual, but is in the nature of a permanent record. Those are internal records. The question that we spotlighted is the contention that records that John Doe would need in order to show his status at USI if he were to go to school elsewhere, whether those records bear any indication of suspension at all today. Will they or will they not if an injunction is not does not? Will it? Will that change if we affirm the denial of an injunction? No, he's already begun serving his suspension as of the date that the stay of that of the district court ruling became effective. So I can tell you as of today, his transcript does not reflect a suspension. Are there other publicly available documents that would reflect the if he was seeking to transfer, is there another document that would convey his suspension to the school he's seeking to transfer to? No ordinary course document. If he, for example, asked for something that he's entitled to as a student to access, I suppose he could ask for one of these permanent internal records and make it available, but that would be his choice. The ordinary course disclosure to another school is the transcript. And there's a distinction here to bear in mind. John's status is a suspended student, not an expelled student. It's a very important distinction in academia. So he remains an admitted student of the university. He remains entitled to re-enroll at the end of his suspension, does not have to reapply to university. The university treats him as an admitted student who is simply ineligible to enroll during the three semesters of suspension. That's it. And if he comes back at the end of the three semesters, complies with the requirement at that time to affirm that he's prepared to comply with campus regulations and so forth, then he picks up where he left off. Well, there's also the impact on the scholarship though. But he would pick up where he left off with the scholarship as well. What about athletics? The same. He could still play? Assuming he didn't use up his eligibility at another school during the three semesters away, yes. So the suspension would not impact his ability to participate in athletics with a scholarship? Not at USI. Another question about irreparable harm, Mr. Keeley. In your brief, you make a kind of contract law argument. You say a student's permission to be on campus and participate in educational activities has a monetary value to the student as measured by what the student is willing to pay for. When something has a purchase price, it also can be priced upon loss. By this measure, John's harm, if any, can be fully rectified by the final judgment after trial. I've got to say, that raised my eyebrows and left me wondering if the administration would agree with you that a USI education is worth exactly the tuition and not a penny more. I'm not arguing that it's exactly the tuition or not a penny more, but it is a purchase transaction. And so we oftentimes buy things that are worth more to the buyer than the purchase price, but that doesn't mean that their value cannot be measured in dollars. And in fact, it's commonplace in these Title IX cases for the plaintiffs to seek damage awards. Oh sure, you seek damages if you don't get the injunction. Everybody's still feeling their way in terms of how to deal with remedies when those are appropriate. Sure, but a damage award is a remedy at law, and so it's not an irreparable harm. There were two points substantively that it would be helpful for me if you could address, Mr. Keeley. One is, it looked to me as if the hearing officer's report did very little to address or engage with inconsistencies in Jane's accounts over time. And I also was concerned about the hearing officer's treatment of the so-called timeline trying to fit Jane's account into, I think, a 14-minute window, which given the photographs that were talked about and the different students' accounts of those wee hours of the morning. I understand that we are not reviewing directly the decision, but I would appreciate any guidance you could offer on those two points of the hearing officer's decision. Yes, certainly. The audio is very vivid in this respect. The hearing officer spends a great deal of time with both John and Jane on this topic, clearly expressing some frustration, some sense that there were loose ends that weren't being fully connected up, and trying to give them ample opportunity to help connect them up. The striking thing to me as a listener to that audio is there is one person in the whole evening's events who was there throughout and was sober throughout, and that was John. If anybody could produce a granular timeline for that night, it was John. But he never did. There is none in the audio from the hearing. Whatever knowledge he had that could have helped sort out with precision the timetable of the evening, he largely chose not to share. In the end, the task comes down to the classic peppercorn metaphor that there is a disputed issue of fact on which the evidence is scant on both sides or troublesome on both sides, flawed on both sides. The difference can be a peppercorn. Here, I think it was more than a peppercorn because there was a critical fact regardless of timeline, and that was three witnesses said that he was. The task was to find out whether or not John was in Jane's bed. If he lost that point, it was downhill from there because why would he deny being in her bed if three witnesses said that he was? The task of the hearing officer in reconciling the timeline comes down, I submit, to the simple question, did she and did the panel working with her Was it a pretext, a sham reconstruction of the night, or was it an honest effort to come to a preponderance determination based on the best available evidence? And how about engaging with Jane's inconsistencies over time? I'm sorry, Your Honor? How about, I didn't see much engagement with Jane's inconsistencies over time. In the audio, there is, because the question of the timing of her reporting was taken up. That was one of the potential impeachment, why the delayed reporting. The question of how precise she was in her reconstruction of the evening, though, I think we have to look at through the lens of the undisputed fact, undisputed by John as well as everybody else, that Jane was very drunk. She was an inexperienced drinker, that's in the record. She was drinking recklessly, without regard to quantity, perhaps because of inexperience. She fell out of her own bed when people tried to put her to bed. That's how intoxicated she was. So the amount of light that she could shed on reconstruction of the timeline, given her condition, is questionable, and I think that was a factor for the panel. Thank you. Can I ask one more question, please? You've relied, or are arguing in part, that the Title VII McDonnell-Douglas framework should apply in the Title IX context. Other than the Hyatt case out of the Tenth Circuit, has any other court applied that framework in Title IX? Not squarely. A number of courts have, in Title IX cases, referred to Title VII case law, for example, to identify types of evidence that would be probative of discriminatory intent, but none, to my knowledge, have squarely adopted McDonnell-Douglas. If it applies, how would you assess the meeting legitimate expectations? That seems completely out of context in Title IX compared to Title VII. I agree. I just don't think that it's a squarely applicable test. What I do think is helpful about that test is that it identifies, well, first, types of direct and indirect evidence that can be probative, and we've tried to speak to that in our briefing. There's no direct evidence adduced at all. There's no statement attributed to anybody at USI, and in terms of indirect evidence, the only evidence that's cited is on the face of the documents, the cold record, which in a Title VII case would be pretty unusual. You would see comparators, which we don't have here. There is no contention that a similarly situated female respondent would have been treated in any way differently than John. So there is some, I think, there are some tools, I'll put it that way, under that jurisprudence that are helpful here. Thank you. Thank you, Mr. Keeley. This is a standalone case. We do not have a case following this. Therefore, Mr. Vandere, I'm going to give you quite a bit of time in rebuttal to equal this out. If we could set the clock at nine minutes. Mr. Vandere, let me recognize you for rebuttal. Let me begin with, go ahead, let me begin with a question for you. As we see the procedural history, it looks like the amended complaint gets filed on October 18th of 2021. There's a motion for preliminary injunction filed shortly thereafter. That gets briefed. The timeframe, did either parties or the court raise the issue of having a hearing on the preliminary injunction? Who raised it? What was the discussion? My recollection of the record is the parties agreed to waive the hearing and go straight to argument, or actually straight to briefing. Judge Sweeney recused himself at some point in November. Judge Pratt got assigned the case. She is the judge who set oral argument. But even before Judge Sweeney, I believe the record shows that the parties agreed to waive a hearing. Thank you. You may continue with your rebuttal argument. Thank you, Judge. The first point I'd like to make in rebuttal, the pretext argument was made by John in the reply brief to the Title VII argument. That's it. And to Judge St. Eve's comment, no, Title VII doesn't apply here. Doe v. Perdue applies here. And so to go back to Judge Hamilton's question about did hiring the outside persons, the Title IX experts, insulate the university, there's a critical fact that's omitted. And that's that USI's Title IX response, she says, I never said the kissing was nonconsensual. That is critical for two reasons. John was charged with three things in this Title IX complaint. Nonconsensual kissing, touching, and digital penetration. So that appeal letter that USI did not turn over until we went the magistrate and did discovery gives you one of two outcomes. One, either Jane is lying, or two, USI proceeded with a manufactured case against John. Now, the purpose of that discussion for me brings you back to Doe v. Perdue. You've got to take it all together. It's the totality of the circumstances. So you have the USI's employee withholding Jane's own written statement. And that goes directly... Can I ask you a question? It sounds like when you talk about suppressing exculpatory evidence, I'd start thinking Brady and Giglio, okay? Sure. And I thought it came out clearly in the hearing, maybe I'm incorrect, that she was no longer contending that the kissing had been nonconsensual. She did, but she changes it in the written appeal because she says, I never said the kissing was consensual. So that goes back to... Well, my question really is, with Brady and Giglio, it only applies to information that defendant doesn't already have, right? Correct. But here, it changed. At the hearing, she says, no, no, the kissing was okay. I understand John, his testimony, and I use that word loosely because nobody's placed under oath in these proceedings, his testimony is it just flat out didn't happen. But Jane changes from the hearing to say, no, it's consensual, to then say, I never told you when I filed the complaint in February that the kissing was nonconsensual. But USI, the charging document here all throughout has kissing, touching, digital penetration. So why is that critical? Because the regulations say that the hearing panel, the decision makers, have to make a charge. If they made a finding on kissing, they have to exonerate John. And that goes straight to the questions that Judge Hamilton was asking about... But how would they have to exonerate him? They could exonerate him on the kissing. That's right. But what about the other two more serious charges that the sanctions were based on? But if they exonerate him on the kissing, it goes straight to Jane's credibility because at that time, everything into the record, from her interview with public safety to the sheriff, it all led to kissing, touching, digital penetration without consent. So it goes to the credibility. The goalposts continue to move from Jane's story. But that ultimately gets you to the merits of the case. Where we're at here is we just need to show the court, and we feel strongly that we do, some likelihood of you take all of them together, the public pressure, the procedural irregularities, the statement from Jane after the fact that, in fact, I never said it in February, when you take all that together, we submit to this court that top-shelf experts, they just don't make mistakes. They might make one. They might make two, call that negligence. But 12 mistakes of the regulations? And with regard to the regulations, I see that being a more of a legal argument, that there's an analysis of what the regulations require based upon an objective source, the law. The difficulty with the anti-male bias argument is that's the type of allegation or complaint as lawyers, we hear and we say, well, what's the evidence? And here without the hearing, there's the label of anti-male bias. But we're looking for that proof. We're looking for some type of support for that label. And given the record that we have here, that's difficult to see. And I would submit to the court that in these cases, especially where we are here, there's been two instances of discovery, one interrogatory and another interrogatory. USI, not John, has all the evidence. The two times we were able to get evidence, however, we get Jane's appeal letter that we talked about where we know that cuts in favor of John. And then we found out Jane's no longer a student at USI. That cuts in favor of the balancing of harms. What else is there out there? So we are on a cold case, but we don't have all of that evidence. But that's how these cases are. There's not going to be a hearing officer, a decision maker who's going to come out and say, well, you know, I just don't really like males, so I'm going to find against you. But it's interesting in the written opinion or decision that the decision makers made, they said that John, because he's a respondent, would have a reason to lie. That's why in Purdue, this court has said you've got to take the totality of the circumstances. You have to take it all together. And you have to take it all together with where we are in this case. And that's at a very early stage. And that's at a stage where the status quo is a temporary restraining order that was entered by the Vanderbilt County Circuit Court in September. And we submit to this court respectfully, and we also thank the court for expediting this appeal. Are you suggesting that the issuance of the TRO changes the status quo for purposes of the preliminary injunction analysis? No, Judge. I'm saying the TRO was the status quo until the district courts may order. Well, if I'm a district judge, though, you're telling me if I've issued a TRO, that's my status quo, and I'm committed to that. Certainly the district court's not committed to it. What I'm submitting to this court is that's what should continue to remain in effect because John has satisfied the necessary elements for the preliminary injunction in light of Purdue, in light of the Title IX context. Again, I appreciate the court expediting this. Thank you very much. Thank you, Mr. Vandere. Thank you, Mr. Keeley. Thanks for all involved. The case will be taken under advisement.